Joseph E. PLATER, Samuel J. Capies, and Anthony R. Morrison, Appellants,

v.

UNITED STATES, Appellee.

Nos. 97–CF–140, 97–CF–143, 97–CF–486.

District of Columbia Court of Appeals.

Argued Sept. 21, 1999.

Decided Feb. 17, 2000.

---

Peter N. Mann, appointed by the court, for appellant, Joseph E. Plater.

Michael Lasley, Washington, DC, appointed by the court, for appellant, Anthony R. Morrison.

Christopher S. Merriam, Washington, DC, appointed by the court, for appellant, Samuel J. Capies.

Anthony Barkow, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and Timothy J. Heaphy, Assistant United States Attorneys, were on the brief, for appellee.

Before REID and WASHINGTON, Associate Judges, and BELSON, Senior Judge.

WASHINGTON, Associate Judge.

Appellants Plater, Morrison, and Capies were indicted on charges of second-degree murder while armed,[1] and tried jointly. A jury convicted Capies and Plater of voluntary manslaughter, while armed.[2] Morrison was found guilty of voluntary manslaughter, unarmed.[3] The appeals of Plater, Morrison, and Capies were consolidated by this court. Plater, Morrison, and Capies seek reversal of their convictions based on several grounds. Appellants argue that the trial judge erred by: 1) refusing to instruct the jury on lesser-included charges of aggravated assault for Morrison and assault with a deadly weapon for Capies; 2) refusing to grant Plater's motion for a mistrial based on an improper statement by the prosecutor in his opening statement; 3) denying Plater's motion to sever his trial from non-testifying co-defendants Morrison and Grayson,[4] violating his Sixth Amendment Right to Confrontation; and 4) denying Morrison's motion to suppress his videotaped confession because it was involuntary. We affirm.

## I. FACTUAL BACKGROUND

On June 27, 1996, at approximately 9:00 p.m., Thomas Davis, the decedent, was walking with Vanessa Price, Price's nine-month old granddaughter, and another eight-year-old girl in the area of 16th and East Capitol Streets, N.E. While walking on the north side of East Capitol street, returning to Price's home, Davis was stopped by Capies. Capies confronted Davis, who attempted to run before Capies struck him in the face with a bottle. Thereafter, Capies held Davis while five other men, including Plater and Morrison, began to viciously beat Davis and continued while he fell to the ground. Davis managed to raise himself off the ground and attempted to flee toward the south side of East Capitol street.

The group followed Davis across the street and continued to beat him using various weapons, including a stick, a pipe, and a bat. Davis, again, fell to the ground where his head was pounded against the cement curb. The assailants fled the scene, leaving Davis on the curbside. Davis died on July 2, 1996 from brain swelling due to the grave injuries inflicted from the beating.

## II. ANALYSIS

### A. Lesser–Included Offenses

Capies and Morrison contend that the trial court erred in denying their requests for jury instructions on the lesser-included offenses of assault with a deadly weapon and aggravated assault, respectively. They argue essentially that their confrontation with the decedent was a separate and distinct event, or, alternatively, that they withdrew prior to the fatal blows that killed Davis. For the following reasons, their arguments are without merit.

An instruction on a lesser-included offense is justified if (1) all elements of the lesser offense are included within the offense charged, and (2) there is a suffi-

1. D.C.Code §§ 22–2403, –3202 (1996)

2. D.C.Code §§ 22–2405, –3202 (1996)

3. D.C.Code § 22–2405

4. Taj A. Grayson was also tried with the three appellants, but is not a party to this appeal.

cient evidentiary basis for the lesser charge.[5] *Boykins v. United States*, 702 A.2d 1242, 1250 (D.C.1997) (citations omitted); *see also Day v. United States*, 390 A.2d 957, 961 (D.C.1978).

In this case, Capies and Morrison argue, respectively, that assault with a deadly weapon and aggravated assault are lesser-included offenses of voluntary manslaughter, and that based on the evidence in the record they were entitled to have the jury instructed on those lesser-included offenses. Although aggravated assault and assault with a deadly weapon have not been explicitly recognized as lesser-included offenses of voluntary manslaughter in this jurisdiction, there is some support for this contention in dicta of prior decisions of this court. *See Day*, *supra*, 390 A.2d at 961–62 (citing *Logan v. United States*, 144 U.S. 263, 307, 12 S.Ct. 617, 36 L.Ed. 429 (1892) (dicta), *United States v. Hamilton*, 182 F.Supp. 548, 551 (D.D.C.1960) (dicta)). However, we need not decide in this case whether assault is a lesser-included offense of voluntary manslaughter because we find that the evidence in the record is insufficient to support a jury instruction on the requested lesser-included offenses.

Capies and Morrison each rely on testimonial evidence to support their respective contentions that there was sufficient evidence in the record to warrant lesser-included assault instructions being given to the jury. Capies argues that Jeffrey Drummond's testimony, that he picked Capies up from the area of the assault on his way to band practice, could lead a reasonable juror to infer that Capies struck Davis in the face with a bottle and then left with Drummond before the group assault began; thus his assault was a separate event entitling him to a lesser-included instruction. Morrison relies on his own statement to the police, in which he admits to punching Davis twice with his fist while Davis was on the side of the street opposite from that on which the decedent died.[6] In the alternative, Capies and Morrison contend their respectively proffered evidence raises an inference that they withdrew from the group assault at some point and that their withdrawal constitutes sufficient grounds for giving jurors a lesser-included assault instruction. We disagree.

Despite their assertions to the contrary, neither Drummond's testimony nor Morrison's statement raises a reasonable inference that the actions of Capies and Morrison during the assault against Davis were separate and distinct from the involvement of the other participants in the assault. The only reasonable inference that can be drawn from Drummond's testimony is that Capies did not assault Davis because he was not present during the assault.[7] Morrison's statement at most suggests that he stopped beating Davis before Davis was finally killed. However, no reasonable juror viewing this evidence could possibly conclude that Capies and Morrison were somehow involved in a separate assault. To the contrary, the overwhelming evidence indicates that they were inextricably involved in the very assault that led to Davis' death. The undisputed evidence is that Capies struck the first blow hitting

---

**5.** "The requirement of a sufficient evidentiary basis can be met by a showing that: (1) there is conflicting testimony on a factual issue, or (2) the lesser-included offense is fairly inferable from the evidence." *Price v. United States*, 602 A.2d 641, 644 (D.C.1992). The standard requires the production of some evidence that offers a rational basis for the instruction. *See Rease v. United States*, 403 A.2d 322, 328–29 (D.C.1979); *West v. United States*, 499 A.2d 860, 865 (D.C.1985).

**6.** Morrison submits that two separate assaults occurred, the first on the north side of East

Capitol street and the second fatal assault on the south side of East Capitol street where the blows that killed Davis were delivered, and that his participation was limited to the first, non-fatal assault.

**7.** The parties stipulated that the emergency calls reporting the beating of Davis were placed at approximately 9:00 p.m. Therefore, Drummond's testimony that he picked up Davis at 7:15 p.m., could only provide an alibi for Capies, and the trial court properly instructed the jury on this theory of defense.

Davis in the face with a bottle. Capies then held Davis while Morrison and Plater, among others, viciously beat him. After Davis was originally knocked to the ground, he attempted to flee but got no further than the other side of the street before the beating continued. The entire episode lasted no more than twenty minutes. The evidence in this case clearly and unequivocally establishes that the beating of Davis was "a continuing course of assaultive conduct, rather than a succession of detached incidents," *In Re T.H.B.*, 670 A.2d 895, 900 (D.C.1996) (citation and internal quotation marks omitted), and in this jurisdiction it is well settled that an assault that results in a death is a homicide. *See Hebron v. United States*, 625 A.2d 884 (D.C.1993). Both Capies and Morrison participated in the assault that resulted in Davis' death and as a matter of law, they were not entitled to a jury instruction on any charge other than the homicide charge.

▪ The alternative argument raised by Capies and Morrison that they withdrew from the assault before the decedent was killed and thus were entitled to a lesser-included assault instruction is equally without merit. Legal withdrawal has been defined as "(1) repudiation of the defendant's prior aid or (2) doing all that is possible to countermand his prior aid or counsel, and (3) doing so before the chain of events has become unstoppable." 2 LA-FAVE & SCOTT, SUBSTANTIVE CRIMINAL LAW § 6.8(d), at 162 (2d ed.1986). In *Harris v. United States*, 377 A.2d 34, 38 (D.C.1977), this court expressed that to withdraw from a criminal venture a defendant charged as an aider and abettor "[m]ust take affirmative action to disavow or defeat the purpose, or definite, decisive and positive steps which indicate a full and complete disassociation." (citations omitted). The defendants' fleeing of the crime scene after participating in the assault does not

constitute legal withdrawal. *See* LAFAVE AND SCOTT, *supra*, § 6.8(d) (commenting that "simple flight from the crime scene is not enough"); *Harris, supra*, 377 A.2d at 38. There is no evidence in this case to support a withdrawal instruction or an assault instruction, and a finding otherwise "would undertake an unwise and impermissible bizarre reconstruction of the evidence." *West, supra*, 499 A.2d at 865 (citing *Wood v. United States*, 472 A.2d 408, 410 (D.C.1984)).

## B. Denial of Motion for a Mistrial

Plater argues that the trial judge erred by denying his motion for a mistrial based on an improper comment by the prosecutor in his opening statement. Specifically, the prosecutor indicated that the statements of Grayson and Morrison could be used as evidence against all four defendants in the crime.[8]

▪ As an initial matter, "we emphasize that although appellant['s] complaint is primarily with the prosecutor, it is our function to review the record for legal error or abuse of discretion by the trial judge, not by counsel." *Irick v. United States*, 565 A.2d 26, 33 (D.C.1989) (citation omitted). The decision to order a mistrial is subject to the broad discretion of the trial court and our standard of review is deferential. *Wright v. United States*, 637 A.2d 95, 100 (D.C.1994). This court is only inclined to reverse "in extreme situations threatening a miscarriage of justice." *Id.* (citing *Goins v. United States*, 617 A.2d 956, 958 (D.C.1992)).

▪ When analyzing claims of prejudicial prosecutorial conduct, it is first necessary to "determine whether the prosecutor's actions were improper." *Diaz v. United States*, 716 A.2d 173, 179 (D.C. 1998) (citation omitted). In this case, we will assume that the prosecutor's actions

---

8. Plater also argues on appeal that the prosecutor's comments regarding the use of the extrajudicial statement against all four defendants violated his Sixth Amendment right to

confrontation under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). This issue will be discussed in Section C, *infra*.

were improper given that he was reprimanded by the trial judge for his comments.

■■■ Then, we must determine if the comments caused substantial prejudice to the defendant that warrants reversal. *Diaz, supra,* 716 A.2d at 181. "The applicable test to determine whether [improper prosecutorial comments] caused substantial prejudice is whether we can say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Id.* This court weighs four specific factors when considering the impact of a prosecutor's conduct: 1) the gravity of the impropriety; 2) the direct relationship to the issue of guilt; 3) the effect of corrective instructions by the trial court; and 4) the strength of the government's case. *Id.* (citing *Hammill v. United States,* 498 A.2d 551, 554 (D.C.1985)).

■■■ Even assuming the prosecutor improperly commented that the statements by Morrison and Grayson could be used as evidence against all four defendants, Plater has failed to demonstrate that he suffered substantial prejudice. During jury selection the court had explained that evidence against one defendant could not be used against another, and in its preliminary instructions to the jury the court had further explained that opening statements are not evidence in the case. Additionally, the trial judge offered three separate curative instructions to the jury, clarifying that the extrajudicial confession could only be used for the limited purpose of determining the guilt of the defendant offering the statement. The first curative instruction was offered after the government's opening statement, in response to counsel's timely objection. The second instruction

was given by the court after Grayson's and Morrison's statements were introduced by Detective Jeffrey Williams. Again, in the final jury instructions, the judge offered a third curative instruction to the jury. Therefore, the gravity of the prosecutor's comment was counterbalanced by the judge's official instructions to the jury, and we trust the "almost invariable assumption of the law that jurors follow their instructions." *Wright, supra,* 637 A.2d at 97 (citing *Richardson v. Marsh,* 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)).

Finally, although the prosecutor's comments were directly related to the issue of Plater's guilt, the government's probative evidence in this case was very strong. The government's case included the testimony of several eyewitnesses to the events of June 27, 1996. In particular, three eyewitnesses, Vanessa Price, Eugene Kenny Allen, and Xavier Green, positively identified Plater's presence and active participation in the assault. In this case we are convinced that "the trial judge, proceeded very cautiously, [and] made full use of alternative measures to alleviate any prejudice that might have occurred." *Wesley, supra,* 547 A.2d at 1029. Thus, the prosecutor's improper comments, though worthy of admonishment, do not constitute reversible error.

*C. Sixth Amendment Right to Confrontation* [9]

Plater contends that the trial court's refusal to further redact the statements of his co-defendants, exclude the statements of his co-defendants, or sever his trial from his co-defendants violated his confrontation rights under the Sixth Amendment. Plater argues that the statements of his co-defendants when read in conjunction with the improper opening statement by the prosecutor, and viewed in the context

---

9. A copy of Morrison's and Grayson's redacted statements are attached as an appendix. Specifically, Plater objects to the portions of Morrison's statement in which he narrates the group beating of Davis and uses the pronoun "we":

We was all around "A" Street. And the guy Boo [Davis] was walking down the street. That mean he coming around here so that means that he giving us a cue that he was gonna kill us. We walked around the corner and jumped in. All of us jumped in it.

of the other evidence submitted by the government, expressly or at least inferentially, incriminates him and thus runs afoul of the United States Supreme Court's decision in *Bruton, supra* note 8, and its progeny.

■■■ The use of a statement by a non-testifying co-defendant that expressly implicates the defendant violates the defendant's Sixth Amendment right to confront the witness testifying against him. *See Bruton, supra* note 8, 391 U.S. at 126, 88 S.Ct. 1620. This rule was further refined in *Richardson, supra,* 481 U.S. at 211, 107 S.Ct. 1702 (1987), where the United States Supreme Court rejected the "contextual implication" doctrine used by the Sixth Circuit Court of Appeals to determine whether a *Bruton* issue existed, *id.* at 209, 107 S.Ct. 1702, and held that where a defendant's name and any reference to the defendant's existence are eliminated from the co-defendant's extrajudicial statement, the statement is properly admitted, with limiting instructions, regardless of any inference of the defendant's guilt that arises when the statement is linked with other evidence presented at trial. Soon thereafter, this court in *Foster v. United States,* 548 A.2d 1370 (D.C.1988), was faced with a circumstance where the redacted statement did not eliminate any and all references to a defendant, but instead substituted a neutral reference for the defendant's name.[10] In *Foster,* while finding a denial of the right of confrontation in light of the evidence adduced at trial, this court held that a redacted statement that does not eliminate all references to the existence of a defendant, but substitutes a neutral pronoun in place of an individual's name may be properly admitted at trial, along with limiting instructions, without violating a defendant's right to confrontation, unless a substantial risk exists that the jury will consider the statement when determining the defendant's guilt. After we issued our decision in *Foster,* the United States Supreme Court revisited the issue of the admissibility of co-defendant statements in *Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998). In *Gray,* the redacted extrajudicial statement the government sought to introduce into evidence had not eliminated any and all references to the existence of other defendants, but had merely substituted the word "deleted" for the names of the individuals involved. The United States Supreme Court held that the use of a redacted statement that reads "[m]e, deleted, deleted, and a few other guys," was unconstitutional because the use of "obvious indications of alteration" facially incriminated the defendant because its reference to his identity could be inferred from the statement itself. *Gray, supra,* 523 U.S. at 193–97, 118 S.Ct. at 1156–57.[11] The Court

---

10. In *Richardson, supra,* 481 U.S. at 211 n. 5, 107 S.Ct. 1702, the Court expressly reserved judgment on extrajudicial statements that replace a defendant's name with a symbol or neutral pronoun.

11. In *Foster, supra,* 548 A.2d at 1378, we held that it was appropriate to use "contextual analysis" (a term not used by the Supreme Court in *Gray* ) in order to determine whether there was a substantial risk that the jury would consider the nontestifying co-defendant's statement in deciding the guilt of the defendant. To make that determination, we stated, the trial court must "consider the degree of inference" the jury must make to connect the defendant to the statement, and that such an "assessment will require consideration of other evidence to determine whether the redaction is effective, when taken in context, to avoid linkage with the defendant." *Id.* at 1379. The *Foster* court then went on to consider testimony of five government witnesses as well as other evidence in determining that the risk was so substantial that the statements of the non-testifying co-defendant should not be admitted. The Supreme Court, interpreting *Richardson* in its recent *Gray* opinion, essentially ruled out the consideration of other evidence when determining whether a statement inferentially incriminates a defendant: "We concede *Richardson* places outside the scope of *Bruton's* rule those statements that incriminate inferentially. We also concede that the jury must use inference to connect the statement in this redacted confession with the defendant. But inference pure and simple cannot make the critical difference...." *Gray, supra,* 523 U.S. at 195, 118 S.Ct. at 1156 (citation omitted). *"Richardson*

further clarified its holding in *Gray*, suggesting that the statement, "[m]e and a few other guys," would have passed constitutional muster. In reaching its decision, the Court in *Gray* reaffirmed its rationale in *Richardson* that an inference based on other evidence introduced at trial to determine whether an extrajudicial statement is incriminating can be inappropriate.[12]

■■■■ The admission of the extrajudicial statements in this case did not violate Plater's Sixth Amendment Confrontation right under *Bruton* as interpreted by *Richardson* and *Gray*. Nor does it violate Plater's right to confrontation if we consider inferences based upon all of the evidence, as this court suggested in *Foster*. In the instant case, similar to the factual scenario in *Richardson*, there was no reference to Plater's existence or participation in the offense because the statements did not introduce the names or descriptions of individual participants. The use of the plural neutral pronoun, "we," when referring to the group who attacked the decedent, in no way specifically linked Plater to the crime because there was no dispute that the incident was a group assault. Thus, the use of "we" was not prejudicial because the term "we" does not connote a particular number of people or single out any individual person. Furthermore, there was no symmetry between the number of alleged perpetrators and the number of defendants on trial; therefore, it was wholly questionable whether any of the defendants, other than the defendant who gave the statement, were involved in the offense. Finally, the use of the neutral plural pronoun "we" comports with the proposed redaction, "[m]e and a few

---

must depend in significant part on the *kind* of, not the simple *fact* of, inference." *Id.* at 196, 118 S.Ct. at 1157. The simple deletions or omissions of names at issue in *Gray* "obviously refer directly to someone, often obviously the defendant," and the inferences from them were ones "a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." *Id.* The government urges in this case that if we conclude that a *Foster* contextual analysis demands exclusion of the co-defendant's statements, we should reconsider *Foster's* vitality in light of *Gray*. As we are satisfied that application of *Foster's* holding would not require exclusion, we need not make a holding regarding *Foster's* vitality, but note the evolution and clarification of *Bruton* principles by the Supreme Court after *Foster* in the course of holding that, in this case, there was no violation of the Confrontation Clause. If the trial court should face a situation in which the application of *Foster's* approach would lead to a different result than application of *Gray*, the court of course should follow Supreme Court precedent.

**12.** Since the United States Supreme Court decision in *Gray*, several circuit courts have interpreted *Bruton–Richardson* as modified by *Gray*, and determined that a court should only look to the face of extrajudicial statements by non-testifying co-defendant in discerning if the statement is expressly or inferentially incriminating. *See, e.g., United States v. Akinkoye*, 174 F.3d 451, 457 (4th Cir.1999)

(finding no *Bruton* violation where the use of neutral phrases "another person" and "another individual" did not facially implicate the defendant); *United States v. Vejar–Urias*, 165 F.3d 337, 340 (5th Cir.1999) (holding that "[w]here a defendant's name is replaced with a neutral pronoun, as long as identification of the defendant is clear or inculpatory only by reference to evidence other than the redacted confession, and a limiting instruction is given to the jury, there is no *Bruton* violation"); *United States v. Verduzco–Martinez*, 186 F.3d 1208, 1215 (10th Cir.1999) (holding that "[t]he fact that [a][ ] redacted statement may have inferentially incriminated [ ] [the defendant] when read in context with other evidence does not create a *Bruton* violation"); *United States v. Peterson*, 140 F.3d 819, 822 (9th Cir.1998) (expressing that the Court in *Gray* noted "that redactions which do not lead to the inference that a specific person was named and the identity of that person [is] protected through redaction may be appropriate"); *United States v. Wilson*, 160 F.3d 732, 740 n. 5 (D.C.Cir.1998) (commenting that the Court in *Gray* revisited *Bruton* and *Richardson* to clarify the curtailed use of inference in a *Bruton* analysis). *See also* Richard F. Dzubin, *Casenote: The Extension of the Bruton Rule at the Expense of Judicial Efficiency in Gray v. Maryland*, 33 U. RICH. L. REV. 227, 240 (1999), where the author posits that "[t]he *Gray* decision effectively asserts that the Court is following a clear precedent of looking only to inferences that may be drawn from the confession itself."

other friends," that the Court in *Gray* found constitutionally permissible under *Bruton.* Given the above analysis, the trial judge's decision not to sever the trial was appropriate and consistent with the presumption in this jurisdiction that two or more persons charged with jointly committing a criminal offense are to be tried jointly. *See Christian v. United States,* 394 A.2d 1, 20 (D.C.1978).

■ Even assuming *arguendo* that the statements were improperly introduced at trial, the error was harmless beyond a reasonable doubt, *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and reversal of the convictions is not required because there was overwhelming independent evidence of Plater's guilt. *Reynolds v. United States,* 587 A.2d 1080, 1083–84 (D.C.1991).

*D. Suppression of Confession*

At the hearing on Morrison's motion to suppress, appellant argued that after being informed of his *Miranda*[13] rights, he signed a PD–47 card on two occasions, indicating that he would not answer questions without an attorney. Subsequently, Morrison waived his *Miranda* rights and gave a videotaped statement to the police. Morrison contends that his subsequent waiver was involuntary because he was coerced by the actions of the police continuously harassing him, telling him he was lying, questioning him about his two statements, the length of time he was interviewed, and the physical barriers imposed on him.

■ The factual findings of a trial judge's denial of a suppression motion will not be disturbed unless they are without substantial support in the evidence. *Hebron,* 625 A.2d at 885 (citations omitted). A statement by a defendant is inadmissible if it was involuntary, even if the police satisfy all the requirements of *Miranda, supra* note 13; *see also United States v. Bernett,* 161 U.S.App.D.C. 363, 495 F.2d

943, 948–50 (1974). "[T]he test [for voluntariness] is whether, under the totality of the circumstances, the will of [appellant] was 'overborne in such a way as to render his confession the product of coercion.'" *United States v. Thomas,* 595 A.2d 980, 982 (citing *Arizona v. Fulminante,* 499 U.S. 279, 288, 111 S.Ct. 1246, 1253, 113 L.Ed.2d 302 (1991)).

■ The trial judge made findings of fact that Morrison's confession was voluntary after a suppression hearing where appellant testified on his own behalf. The judge concluded that the officers informed Morrison of his *Miranda* rights and that he voluntarily waived them without coercion. The trial judge found, after viewing the videotaped confession, that Morrison expressed that he was not threatened and that he was not forced to give his statement. Additionally, Morrison articulated that he voluntarily changed his mind and did not want a lawyer present. The trial judge further observed that Morrison's disposition appeared comfortable on the videotape. On the record before us, we cannot conclude that the findings of the trial judge are without substantial support in the evidence.

Accordingly, the judgment of the trial court is hereby

Affirmed.

## APPENDICES

### STATEMENT OF TAJ GRAYSON

Q. Mr. TAJ GRAYSON, the Homicide Branch is investigating the beating death of Thomas Davis also known as BOO which occurred on Thursday, July 25, 1995 in the area of 16th and East Capitol Street, S.E.. Can you tell me in your own words what You know about his death?

A. I got home from work and I went around 16th and A Street, Northeast and I saw BOO walking down

13. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

the street. I saw BOO left up his shirt as if he had a weapon on him and then BOO walked across Eastern High School parking lot and sat there. And then we were contemplating what we were going to do. And then BOO left and went up 17th Street towards East Capitol Street. And we followed and we started hitting BOO. BOO tried to run across the street and he fell. So we hit him again and I kicked him in the chest. And then we said come lets go. And we left and went home.

Q. Did you hit Boo with any type of weapon?

A. No.

Q. Did you have any type of weapon on you at any time doing or after the assault on Boo?

A. No.

Q. Did you see anyone else besides yourself kicking Boo?

A. No.

Q. Did Boo have any type of weapon on him?

A. Not that I know of, no.

Q. Did Boo say anything to any of you as he was being assaulted?

A. No.

Q. Was there any plans being made on who was going to do what? Or how you'll were going to approach Boo?

A. No, we just said that we were going to go around there.

Q. Do you have anything else to add to your statement?

A. No, I don't

Q. Can you read and write?

A. Yes.

Q. What is the highest grade you completed in school?

A. Sophomore year in college.

Q. Did we discuss the fact that you may be later charged in the beating death of Boo?

A. Yes, you did.

Q. Did I explain to you that this statement made be used against you at a later time in court?

A. Yes.

Q. Do you understand what that means?

A. Yes.

Q. Did I also explain to you that you were not under arrest and that I will take you back home after this statement is finished?

A. Yes.

Q. Did you give this statement voluntarily and of your own free will?

A. Yes.

Q. At the beginning of this statement I read you your Miranda Rights and explained these rights to you?

A. Yes.

Q. At anytime of this interview did you ask for a lawyer?

A. No.

Q. Did anyone promise you anything in return for your statement?

A. No.

Q. Has anyone threatened you in any way in return for your statement?

A. No.

Q. How have you been treated since you been in this office?

A. Fair.

### APPENDIX

UNITED STATES ATTORNEY'S OFFICE

TAPE TRANSCRIPTION

UNITED STATES OF AMERICA

v.

ANTHONY MORRISON

Laboratory Case Number 61017047 P JB

Department of Justice

Federal Bureau of Investigation

Video Enhancement Unit

Transcript of Video Tape

Date: 7–22–96

**MAYBERRY:** Today's date is Monday, July 22, 1996. My name is Detective Mayberry. We have Detective Williams and we have Mr. Anthony? . .

**DEFENDANT:** Morrison.

## INTERVIEW

**MAYBERRY:** Morrison. This interview is being conducted in reference to the homicide which occurred on July 2nd, 1996 in which the decedent is Mr. Donnell Davis.

**WILLIAMS:** The decedent is Thomas Davis.

**MAYBERRY:** Thomas Davis. I'm sorry, before we start this interview, Mr. Morrison, I want to ask you a couple of questions. First of all, have you been treated fairly since you've been at the Homicide office?

**MORRISON:** Yes I have.

**MAYBERRY:** Have you been threatened by . . . threatened by anybody since you've been at the Homicide office?

**MORRISON:** No. I have not.

**MAYBERRY:** Have you been forced to give . . . make this statement that you're about to make?

**MORRISON:** No I haven't.

**MAYBERRY:** Are you under any medication of any type?

**MORRISON:** No.

**MAYBERRY:** I might have forgot to give the time that this interview started but its 11:58 a.m.

Mr. Morrison, first thing we gonna do. We're gonna go over . . . the rights card. You filled out two rights cards, is that correct?

(DEFENDANT NODDED)

**MAYBERRY:** We're gonna go over the first rights card that you filled out with Detective Williams.

**WILLIAMS:** Okay. On the back rights card. How about the right. How about reading the rights card on the front.

**MORRISON:** You are under arrest. Before we ask you any questions, you must understand what your rights are. You have the right to remain silent. You are not required to say anything at any time to answer any questions. Anything you say can be used against you in a court of law. You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning. If you cannot afford a lawyer and want one, a lawyer will be provided for you. If you want to answer questions now without a lawyer present, you will still have the right to stop answering at anytime. You also have the right to stop answering questions at any time until you talk to a lawyer.

**WILLIAMS:** Okay. Flip the card on the other side. That's the waiver. Can you read the question number one for me?

**MORRISON:** Have you read or have read to you the warning as to your right? And I answered yes and my initials.

**WILLIAMS:** Okay.

**MORRISON:** Do you understand this right? Yes, with my initials.

Do you wish to answer any questions? Yes, with my initials.

Are you willing to answer questions without having an attorney present? I put 'no' but I scratched it out and put 'yes.'

**WILLIAMS:** Why did you scratch it out and put yes?

**MORRISON:** Why? Because I wasn't sure at first.

**WILLIAMS:** Okay, but you did that voluntarily?

**MORRISON:** Yes I did, on my own.

**WILLIAMS:** Okay.

**MORRISON:** Then I initialed it and signed my name.

**WILLIAMS:** Okay.

**MAYBERRY:** Alright. There's a second rights card. Well, before we get to that initially after you signed that waiver agreeing to talk to us you told us a story. Is that correct?

**MORRISON:** Yes I did.

**MAYBERRY:** Okay. Briefly tell us what you told us when the first rights card was read to you and you agreed to talk to us.

**MORRISON:** That I was coming down from the store and ... me and some guys came from the store and saw a group of boys.

**MAYBERRY:** Okay, and what else?

**MORRISON:** And we went around there and we saw a group of boys beating Boo.

**MAYBERRY:** Okay, and that's the guy who was killed?

**MORRISON:** Yes it was.

**MAYBERRY:** Okay. You originally said without putting words in your mouth that you didn't know who did it?

**MORRISON:** Right.

**MAYBERRY:** Okay. At that point after we explained to you that certain things you said didn't match up with what we had in the investigation you then agreed to ...

**MORRISON:** Answer.

**MAYBERRY:** ... tell the truth?

**MORRISON:** Yes I did.

**MAYBERRY:** Okay. As to really what happened as far as that night?

**MORRISON:** Yes. After really thinking about what my life consequences were I came out and talked to you.

**MAYBERRY:** Also at that point you were concerned about what you might say may be changed or, or, or, not put the way you say it? Is that correct? .

**MORRISON:** Yes.

**MAYBERRY:** And at that point you also stated that you wanted to really tell us the truth but you thought you might need a lawyer present, is that correct?

**MORRISON:** Yes.

**MAYBERRY:** Okay. At that time were you informed by myself and Detective Williams that you wanted a lawyer at this time we had to stop talking to you?

**MORRISON:** Yes.

**MAYBERRY:** And those were your rights, right?

**MORRISON:** Yes. Absolutely

**MAYBERRY:** Did it come a point in time a little while later that you told myself and Detective Williams that you wanted to talk to us? You wanted to tell the truth?

**MORRISON:** Yes. That's the truth.

**MAYBERRY:** Without a lawyer present?

**MORRISON:** Yes, that's true.

**MAYBERRY:** Did myself or Detective Williams in any way make you change your decision about what you wanted to do?

**MORRISON:** Well, yes and no. When I say yes and no, I mean you was really telling me what was the right thing other than lying.

**MAYBERRY:** Well, at that point, we told you we couldn't talk to you and we stopped talking to you. Is that correct?

**MORRISON:** Right. Yes.

**MAYBERRY:** Okay. As far as telling you about right and wrong, that was before you initiated you wanted the lawyer.

**MORRISON:** Right.

**MAYBERRY:** Okay. Again, did we force you to talk to us ...

**MORRISON:** Not at all.

**MAYBERRY:** When you said you wanted a lawyer?

**MORRISON:** Not at all.

**MAYBERRY:** Did anybody threaten you and say if you didn't talk to us without a lawyer present something would happen?

**MORRISON:** No.

**MAYBERRY:** Have we promised you anything for giving a statement?

**MORRISON:** No, sir.

**MAYBERRY:** Okay. And you know that you don't have to talk without a lawyer present, is that correct.

**MORRISON:** Yes sir.

**MAYBERRY:** And you giving this statement of your own free will and your not being forced or coerced by anybody.

**MORRISON:** No, I'm not.

**MAYBERRY:** This is the second rights card that you filled out. The same card, is that correct? As the first one?

**MORRISON:** Yes sir.

**MAYBERRY:** Okay. I'm not gonna have you read it again. But as far as the first question—have you read or have read to you a warning as to your rights? What was your answer?

**MORRISON:** Yes.

**MAYBERRY:** And what did you put beside it?

**MORRISON:** My initials.

**MAYBERRY:** The second question— do you understand these rights?

**MORRISON:** Yes.

**MAYBERRY:** And what did you put beside it?

**MORRISON:** My initials.

**MAYBERRY:** And the third question—do you wish to answer questions, any questions?

**MORRISON:** Yes.

**MAYBERRY:** What you put?

**MORRISON:** I put in my ... my initials.

**MAYBERRY:** And what answer?

**MORRISON:** Yes.

**MAYBERRY:** Okay. And the fourth question — are you willing to answer questions without an ... without having an attorney present?

**MORRISON:** Yes I would.

**MAYBERRY:** And what did you put beside it?

**MORRISON:** My initials.

**MAYBERRY:** And then, did you sign your name?

**MORRISON:** Yes I did.

**MAYBERRY:** And that's at 11:21 a.m.?

**MORRISON:** Yes.

**MAYBERRY:** Today's date. Okay. Alright. We want to do now is go over the events of what happened.

**WILLIAMS:** On June ... on Thursday, June 27th, 1996. And that's in reference to the beating death of a gentleman you know by the name of Boo.

**MORRISON:** I don't know him.

**WILLIAMS:** You don't know him. But you know his name is Boo though?

**MORRISON:** Yes.

**WILLIAMS:** Okay. Also known as Thomas Davis. So can you tell us the circumstances that surrounded his death?

**MORRISON:** You mean what started it? How it started?

**WILLIAMS:** Right. How it started from the beginning.

**MORRISON:** Okay. From the beginning. We was all around "A" street. That's 16th and "A" where I live. And the guy Boo was walking down the street. (PAUSE) that mean he coming around here so that means that he giving us a due that he was gonna kill us. But I mean I'm not saying that's what's going through his head. But he ... We walked around the corner and jumped in. All of us jumped in it. So I hit him twice. That's all I did. I didn't have no weapons. Only thing I used

is my bare hands and as you can see on my hand that that's where I hit him at on his jaw and that was it and I moved away.

**WILLIAMS:** What do you have on your hand?

**MORRISON:** Like a ... my knuckle and a scrap. My knuckle bust and a scrap.

**MAYBERRY:** And y'all were together?

**MORRISON:** Yes.

**MAYBERRY:** And ... Boo the guy that was killed?

**MORRISON:** Yes.

**MAYBERRY:** Y'all saw him walking on the street?

**MORRISON:** Yes.

(PAUSE)

**MAYBERRY:** When your group saw him tell me exactly what happened as far as did y'all approach him or did he approach y'all?

**MORRISON:** I'll say we approached him. when we went around the the intention was not to kill. It was not. It was just to let him know that. I mean. You threatened our lives. And ... we just jumped him.

**WILLIAMS:** Let me ask you this. When y'all went around there did y'all have, did anyone have sticks, bats, or poles or anything with them?

**MORRISON:** Wasn't no sticks, bats, or poles. I mean as far as when I went around there. When I went around there nobody had no sticks or poles.

**MAYBERRY:** Let me ask you this going back a little bit. When y'all saw him. You said he threatened y'all. Did he threaten y'all as a group? or did he just threaten one member of the group with this gun?

**MORRISON:** I said one member of the group.

**MAYBERRY:** And going back a little farther. Can you tell me how all this got started. About the threats and everything?

**MORRISON:** Well, before all this started. I don't know if it was around A Street. I'm going by he-say she-say cause that's what they told me.

**MAYBERRY:** Okay.

**MORRISON:** That ... I don't know if it started around 15th Street or did it start on A Street. It comes to say that somebody threw a rock at Boo's car and Boo came out with a rifle with Tye. Whoever Tye is? That's Boo's best friend as far as I know.

**MAYBERRY:** Okay.

**MORRISON:** What I was told, they said Boo told Tye "Go get that" So, that's how it started so, they left real fast like they was scared too.

**MAYBERRY:** Okay. Okay. Did Boo shoot this gun during that incident?

**MORRISON:** No.

**MAYBERRY:** As far as you know?

**MORRISON:** As far as I know? No. I know he just pointed it out.

**MAYBERRY:** And this lead up to the incident where Boo was beat?

**MORRISON:** Yes.

**MAYBERRY:** Now getting back to the beating. You say you hit Boo twice. And where'd you hit him at?

**MORRISON:** I hit him in his jaw.

**MAYBERRY:** Both times?

**MORRISON:** Yes.

**MAYBERRY:** You didn't have a stick or anything?

**MORRISON:** I didn't have a stick, or pole, or anything.

**MAYBERRY:** Anybody else hitting on Boo?

**MORRISON:** It was some other dudes that were there.

MAYBERRY: Do you know who they are?

MORRISON: No I don't.

MAYBERRY: How about the other two guys that were with you?

MORRISON: I'm saying just like I said I don't know if they had hit him or not. That was with us. I don't know 'cause I didn't pay attention just like I said I knew what was going on but then again I didn't want to know. But I looked anyway.

MAYBERRY: Okay. When you hit Boo was he standing up or on the ground?

MORRISON: He was on the ground.

MAYBERRY: Okay. So you hit him while he was on the ground?

MORRISON: Yes.

MAYBERRY: You remember what you had on that day?

MORRISON: I know I had on jeans and a shirt.

MAYBERRY: Okay, blue jeans, black jeans, faded jeans?

MORRISON: Blue jeans.

MAYBERRY: Long?

MORRISON: Yes.

MAYBERRY: Do you have a nickname?

MORRISON: Tone Tone. Yes.

MAYBERRY: Tone Tone. So after Boo is beaten what do y'all do then?

MORRISON: We left and went back around "A" street.

MAYBERRY: When y'all ... After he was beaten was he just left on the scene then?

MORRISON: Yes.

MAYBERRY: Was he moving?

MORRISON: Well I saw his feet, when I was leaving, was moving.

MAYBERRY: Was he saying anything?

MORRISON: No. Not that I know of.

MAYBERRY: Was he bleeding?

MORRISON: He was bleeding.

MAYBERRY: On what part of his body?

MORRISON: From his head.

MAYBERRY: From his head?

MORRISON: Yes.

(PAUSE)

MAYBERRY: I think earlier you mentioned some other guys kinda jumped into it too.

MORRISON: Yes I was saying it was at that time it was hot. When its not people come out. So it was a lot of people who was out there that had somethin' ... They probably knew what was happening but they probably, anybody could've hit him. Put it that way.

MAYBERRY: Okay.

MORRISON: 'Cause it was a lot of people out there I don't know who's friends was who. I know what friends was ours.

MAYBERRY: But you know for a fact that you hit him at least twice?

MORRISON: Yes I did.

MAYBERRY: You say you ... After, After y'all left the scene there where Boo was down at y'all went back to "A" street?

MORRISON: Yes we did.

MAYBERRY: Did you talk about what happened?

MORRISON: Yes we did. We all talked about how we were going to be protected.

MAYBERRY: Were any of you drinking when this happened?

MORRISON: When we was ... yes we was.

MAYBERRY: What were you drinking?

MORRISON: We was drinking little beers, little Heinekens.

**MAYBERRY:** Were you high?

**MORRISON:** No we wasn't.

**MAYBERRY:** Anybody smokin?

**MORRISON:** We was just drinkin.

**MAYBERRY:** Just drinking. About what time of the day did this happen?

**MORRISON:** It was around 7:30 . . . It was getting dark so it was probably around 7:30, 8. Whatever time it be getting dark it was close to that time.

**MAYBERRY:** Let me ask you this, did anybody hit him, hit Boo in the face with a bottle or anything before the-

**MORRISON:** I don't know. Unless that happened before I came around there.

**MAYBERRY:** Well let me ask you this. Did y'all still have beer bottles with you when y'all?

**MORRISON:** No.

**MAYBERRY:** Or anykind of bottles with you?

**MORRISON:** No we didn't have.

**WILLIAMS:** Did Boo have any type of weapon on him?

**MORRISON:** Did he? No he did not.

**MAYBERRY:** Did anybody go in his pockets or anything after he was down or while they was beating him?

**MORRISON:** No. No they didn't.

**MAYBERRY:** Or after?

**MORRISON:** After? Well I don't know after we left.

**MAYBERRY:** After the beating your group went back to "A" street right?

**MORRISON:** Yes sir.

**MAYBERRY:** How about the other guys?

**MORRISON:** Well I don't know where they went. I know everybody left.

**WILLIAMS:** Where the other guys from. What area are they from?

**MORRISON:** Well it's different guys they be on 15th street, 17th street. I mean people that lives around the whole area, the whole neighborhood. I mean they have to come around. Just like I had said earlier that our type of block is not the type of block that cause violence. On our block we party, parties. We celebrate, we celebrate people's birthday. We go out more than we think about doing any type of violence at all.

**MAYBERRY:** Okay. Okay.

**MORRISON:** So that's why everybody comes around "A" street.

**MAYBERRY:** Okay.

**MORRISON:** I mean in my house as my family is so open they come to my house. Because they know nobody gonna disrespect nobody in my house.

**MAYBERRY:** Let me ask you this? Was anybody out there who was not involved with this?

**MAYBERRY:** Was there anybody out there who was not involved with this that you know of? Do you remember any of their names or anything like that?

**MORRISON:** Cathy and Sharon I think. I'm not sure Sharon but I know Cathy was out there.

**MAYBERRY:** Okay, did you have blood on yourself?

**MORRISON:** Yes, on my hand. I don't know if it was from my blood or his blood.

**MAYBERRY:** Okay. How about your clothes?

**MORRISON:** I ain't have no blood on my clothes.

**MAYBERRY:** Let me get this straight. Now originally when you talked to us, you said you were out there. Alright.

**MORRISON:** Yes.

**MAYBERRY:** And that you didn't touch him or hit him or anything like that, right?

**MORRISON:** Right.

APPENDIX—Continued

**MAYBERRY:** And nobody else you knew hit him?

**MORRISON:** Right.

**MAYBERRY:** That's what I want clear.

**MORRISON:** Right.

**MAYBERRY:** But at first, you said that you had came from the store and you walked up and they were beating on this guy, well beating on Boo.

**MORRISON:** Yes.

**MAYBERRY:** But you weren't. You said you weren't involved the first time you told us.

**MORRISON:** That's the first time.

**MAYBERRY:** And that wasn't the truth right?

**MORRISON:** It was not the truth. No it was not.

**WILLIAMS:** How do you feel about what happened?

**MORRISON:** Well, like I said before, I wasn't ... we wasn't trying to go around to kill the guy, I mean, I feel, that's what's really been off my conscience the whole time since he been ... I mean that I heard that he died. Our intention was not to go around there and kill him. I mean cause, for my family, I'm not a murderer. I mean, I ain't sayin' to bring anybody in but I'm sayin' anybody around the way can tell you what type of guy I am around my way. But I mean I do feel bad. I mean, I know if you do a crime you gotta do the time, whatever the saying is. But, well, really, before I even struck him, I mean I should have really thought about myself.

**MAYBERRY:** Now, when you say, let me make this clear. When this first incident happens, you're not there, right?

**MORRISON:** Right.

**WILLIAMS:** Is there any plans being then as far as what y'all gonna do to Boo when y'all were around that corner.

**MORRISON:** No, it wasn't. No, it wasn't.

**WILLIAMS:** When y'all catch up with him?

**MORRISON:** No, it wasn't. I'm sayin', I didn't even know how the boy look and I still don't know to this day.

**WILLIAMS:** Okay.

**MAYBERRY:** Let me ask you this? And I forgot to mention it up front. Since you been here, have we given you an opportunity to go to the bathroom?

**MORRISON:** Yes you did.

**MAYBERRY:** Smoke cigarettes?

**MORRISON:** Yes, you did.

**MAYBERRY:** Offered you something to eat?

**MORRISON:** Yes.

**MAYBERRY:** Okay. And just to go over this part about these two statements, the first time when you asked for a lawyer, we stopped talking to you right?

**MORRISON:** Right.

**MAYBERRY:** And it was you who told us that you wanted to talk to you ... talk to us again. That you wanted to tell us the truth. To get this off your chest?

**MORRISON:** Yes.

**MAYBERRY:** So its not anything that we initiated but you told us you wanted to talk to us?

**MORRISON:** Right.

**MAYBERRY:** Anything else you'd like to say?

**MORRISON:** You know. I hope I can get out of this without, well I'll say it this way. The reason I lied at first because I was looking out for my life. Once I do get out ... If I do get out or whatever of this thing that we in. Like if I snitch on somebody, then it get out on the street that I snitched on somebody, somebody

gonna be looking for me and I don't need my family going through that.

MAYBERRY: Anything else?

MORRISON: I would like to say God bless his family, I hope they forgive me.

MAYBERRY: The time is 12:25 p.m., Monday, July 22nd, 1996. This interview is concluded.