Marquette E. **RILEY**, Sayid **Muhammad**, and Antonio T. **Marks**, Appellants

v.

**UNITED STATES**, Appellee.

Nos. 98–CF–1045, 98–CF–1169, 98–CF–1218.

District of Columbia Court of Appeals.

Argued June 22, 2004.

Decided May 3, 2007.

Robert S. Becker, Washington, appointed by the court, for appellant Riley.

Kenneth H. Rosenau, Washington, appointed by the court, for appellant Muhammad.

Peter N. Mann, Washington, appointed by the court, for appellant Marks.

Heather R. Phillips, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Elizabeth Trosman and J. Patrick Rowan, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, and TERRY and SCHWELB, Senior Judges.*

TERRY, Senior Judge:

Appellants Riley and Marks were convicted of two counts of first-degree murder while armed, one count of assault with intent to kill while armed, and one count of possession of a firearm during a crime of violence. Appellant Muhammad was convicted of the same offenses, plus one count each of unauthorized use of a vehicle and destruction of property. On appeal, Riley and Muhammad argue that their Fifth and Sixth Amendment rights were violated during police questioning and that the

---

* Judge Washington was an Associate Judge of the court at the time of argument. His status changed to Chief Judge on August 6, 2005.

Judge Terry was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on February 1, 2006.

Judge Schwelb was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on June 24, 2006.

statements they made to the police should therefore have been suppressed. Muhammad also contends that the trial court abused its discretion in denying his motion to sever his case from those of his co-defendants and in limiting the scope of his counsel's cross-examination. Additionally, each appellant maintains that the admission of his co-defendants' confessions violated the strictures of *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). We affirm.

## I. The Facts[1]

### A. *Events Leading Up to the Murders*

In the early 1990s, a group of teenagers from Suitland, Maryland, formed a group called the Rushtown Crew.[2] The Rushtown Crew was friendly at first with another group from the District of Columbia known as the Fairfax Village Crew. A feud developed between the crews, however, after a fistfight involving members of both groups occurred at a go-go concert. The feud continued to escalate, and in July of 1996, Russell Tyler, a member of the Rushtown Crew, was shot and wounded (but not killed) by members of the Fairfax Village Crew. Following this shooting, the three appellants, who were associated with the Rushtown Crew, discussed going to the Fairfax Village area and shooting at members of the rival crew.

A few weeks after Russell Tyler was shot, Lawrence Lynch, also a member of the Rushtown Crew, was shot and killed. The day after this shooting, some members of the Rushtown Crew, including the three appellants and two of their acquaintances, Wayne Brown and James Stroman, were discussing Lynch's murder. Appellant Muhammad was "doing more of the talking than others." He declared that the Rushtown Crew "should go [to Fairfax Village] and handle their business," that the Fairfax Village Crew had "gone too far," and that it was time that "they got theirs." Appellant Marks then asked to borrow Brown's pump shotgun "to have it around his house just in case Fairfax Village came back through, shooting again."

### B. *The Murders*

On the evening of August 20, 1996, Muhammad told Stroman that he had found out where some members of the Fairfax Village Crew were going to be that night. Stroman, Muhammad, and Riley then drove to Marks' house and picked him up. They were riding in a blue Chevrolet Spectrum that Muhammad had stolen the night before from Shadyside Gardens. Muhammad told Stroman that the four of them— Stroman, Muhammad, Riley, and Marks— were "going to deal with" the Fairfax Village Crew. When they left Marks' house, it was after dark. Muhammad was carrying a rifle, Riley had a .38 caliber revolver, Marks had a pump shotgun (which belonged to Brown), and Stroman had a sawed-off shotgun. Muhammad told Stroman, who was driving, to head toward the Fairfax Village area, and eventually he instructed Stroman to stop the car outside a bank on Pennsylvania Avenue.

At that time Annabelle Littles was living in a house on Pennsylvania Avenue, S.E., with her two sons, Larnell, age nineteen, and Larell, age twelve. Her house was next door to a bank and was attached to another town house on the opposite side. At approximately 9:00 p.m. on August 20, Ms. Littles was at home with her two sons. She was inside the house, while her sons

---

1. Our summary of the facts is based on the evidence presented at trial by the government and on the testimony at the pre-trial suppression hearing. None of the appellants testified or presented any evidence at trial.

2. According to the testimony, a "crew" is another name for a gang.

were outside in the front yard tossing a football with Larell's friend, Robert Johnson, Jr.

When Stroman stopped the car outside the bank, Muhammad got out and "ran up behind" a "tall guy and two other shorter guys." Muhammad pulled out his gun and began shooting. After Muhammad fired the first volley, "the tall boy fell [and] the other shorter guy was like crawling up toward the house." Muhammad then shot at "the shorter guy." Muhammad looked back at his three friends in the car and said, "Get out and kill him." Riley and Marks then jumped out and started shooting while Stroman waited in the car. The "other shorter guy" got away by "running on the side of the house behind the bushes."

After being shot, Larnell Littles, the "tall guy," was able to get up and run to the front door. His mother, hearing the shots, went to the door to see what was happening, and as she opened the front door, she saw Larnell standing there. Larnell came inside and said, "Ma, I been shot," then fell to the floor. Robert Johnson, Jr., the "shorter guy" who did not get shot, ran into the house as appellants drove away and told Ms. Littles that Larell was hurt and would not get up. She immediately went outside and found Larell lying on the ground.

The police arrived about a minute later. An ambulance took Larnell to District of Columbia General Hospital, where he was pronounced dead. Larell was transported by ambulance to Children's Hospital, where he was placed on a respirator, but he died the next day.

Larell had two bullet wounds, and Larnell had shotgun pellet wounds as well as bullet wounds. Crime scene search officers recovered .22 caliber shell casings and 12–gauge shotgun shells from the scene of the shooting. During the course of the ensuing investigation, the police recovered a .38 caliber revolver from Marks' home, a Ruger .22 caliber sawed-off semi-automatic rifle from an alley behind Muhammad's home, and a sawed-off 12–gauge shotgun from Riley's home, as well as the Mosberg 12–gauge shotgun which Brown had lent to Marks earlier that evening. Forensic evidence linked the shell casings and bullets recovered at the scene to two of these weapons. The .22 shell casings were determined to have been fired from the Ruger semi-automatic rifle, while the shotgun shells were found to have been fired from the Mosberg shotgun.

## C. *After the Murders*

Later that evening, all three appellants, along with other members of the Rushtown Crew, were gathered at Marks' house. Marks and Muhammad were bragging about how they had shot "two boys" from Fairfax Village on Pennsylvania Avenue. Stroman said that he had been driving, and Riley said that his gun had jammed when he tried to shoot Larnell Littles. Muhammad told everyone that he had shot both victims. All three appellants stated that they shot at the Littles brothers because they thought they were members of the Fairfax Village Crew.[3]

As the conversation continued, Brown told appellants that they should burn the car that they had used in order to destroy any fingerprint evidence. Brown then called his friend Robin Milbourne to ask for a ride. When Milbourne arrived, Brown went with her to get gasoline. After they returned from the gas station, they followed Riley and Muhammad, who

---

3. Other evidence established, however, that neither Larnell nor Larell Littles was associated with the Fairfax Village Crew.

were driving the blue Spectrum, to a deserted area of the District of Columbia, where Muhammad set the Spectrum on fire. After the car had been burned, Milbourne drove Brown, Riley, and Muhammad back to Marks' house in her car. During the ride back, Riley and Muhammad discussed their actions that night in detail.

### D. *Appellants' Arrest and Interrogation*

Early in the morning of September 9, almost three weeks later, police officers arrested all three appellants for the murders of the Littles brothers. Officers from both Prince George's County, Maryland, and the District of Columbia Metropolitan Police Department were involved in the investigation, arrest, and questioning of appellants. All three appellants confessed to the murders.[4]

### 1. *Riley's Interrogation*

After appellant Riley was arrested on September 9, he was taken to the Prince George's County police station and placed in an interview room by himself. At approximately 9:00 a.m., two Metropolitan Police detectives, Oliver Garvey and Donald Sauls, entered the room. Detective Garvey read Riley his rights from a Prince George's County rights waiver form and told Riley that he had been arrested for the murders of Larnell and Larell Littles. The detective instructed Riley to read the rights form himself and to answer the four questions printed on the form by checking either the "yes" or the "no" box next to each question. Riley checked the "no" box next to the question, "Do you want to make a statement at this time without a lawyer?" Detective Garvey asked him if he was "sure he did not want to talk to us," and he said "yes." Garvey then told Riley that he "couldn't talk to him any

more since he did not want to make a statement without a lawyer present" and left the room. Detective Garvey gave the signed rights form to a Prince George's County detective and told him that Riley had "invoked." In his testimony Garvey explained that the term "invoked" in this instance meant that Riley did not want to make any statements, either with or without an attorney.

At about 10:45 a.m., Detective Dwight DeLoatch, of the Prince George's County Police, briefly entered the interview room to talk to Riley about the murders. At that point he had not spoken with Detective Garvey and did not know whether Riley had previously been interviewed or advised of his rights. DeLoatch told Riley that there were "two sides to every story and that [he] wanted to hear [Riley's] side of the story." Detective DeLoatch also mentioned that he was familiar with the Fairfax Village killings and that other individuals had already implicated Riley in those events. DeLoatch told Riley that he would be back later and walked out of the room.

Detective DeLoatch returned to the interview room about an hour later to escort Riley to the bathroom. On his next visit, at about 1:30 p.m., Detective DeLoatch found Riley more willing to talk; indeed, Riley kept "blurting out" that he did not have anything to do with the Littles murders. The detective replied that before he could talk to Riley and ask him questions, he had to "advise him of his rights" and that Riley had to sign a waiver form. DeLoatch then produced a Prince George's County waiver form, but Riley did not give any indication that he had previously seen such a form. Detective DeLoatch reviewed each question with Riley and told

---

4. Each appellant filed a motion to suppress his statement to the police, and after a hearing the trial court denied all three motions. On appeal Riley and Muhammad contend *in-* *ter alia* that the denial of their motions was erroneous. Marks does not challenge the denial of his motion, but he raises other issues.

him to mark his response to the four questions. Riley again checked "no" in response to the question which asked if he would make a statement without a lawyer. Immediately after he checked "no," he told Detective DeLoatch without prompting "that he wanted to talk to [DeLoatch], but he didn't want to write anything down." DeLoatch responded that the question to which Riley was answering "no" was not concerned with written statements, but rather with whether Riley wished to talk. After hearing this, Riley then checked "yes" next to the question, scratched out his earlier "no" answer, and initialed the change.

During the ensuing conversation, Riley told Detective DeLoatch that he had no involvement in the Littles murders and that he did not even enter the District of Columbia on the day they were shot. DeLoatch responded that he knew Riley "wasn't telling the whole truth about the whole incident and that [he] knew that [Riley] was one of the ones that went to D.C." to shoot at the Fairfax Village Crew. Detective DeLoatch eventually left the room after an hour and a half of discussion, saying that he was going to let Riley "think about it" and that he would be back later to talk with him. Riley was then left alone in the interview room from about 3:00 p.m. until 6:40 p.m.

At 6:00 p.m., Sergeant Daniel Smart, also of the Prince George's County Police, received a telephone call from a man named Mark O'Brien, who said that he was Riley's attorney and that the police should "cease and desist any further efforts to interrogate Riley." Sergeant Smart did not relay this message to Detective DeLoatch because he did not know who Mr. O'Brien was, and he "was aware that Riley had waived his rights to an attorney and it [was his] understanding that an attorney can't call someone and say I am representing this individual without that person requesting an attorney." Riley was not told about O'Brien's telephone call.

At 6:40 p.m., Detective DeLoatch took Riley to be presented before a commissioner. During the processing, Riley asked if DeLoatch could arrange a meeting between Riley and Muhammad. DeLoatch replied that he could and set up such a meeting in another interview room at 7:30 p.m. In the course of their conversation, which lasted about five minutes, Muhammad told Riley to "cooperate," saying that "the police knew everything that [Muhammad] knew" because he (Muhammad) had confessed and told them where the weapons were. After learning that Muhammad had told the police "everything," Riley said he wanted to tell his side of the story to the police.

Detective DeLoatch then spoke with Riley in detail about the shootings, and Riley gave a written statement. In that statement, which was completed at 9:40 p.m., Riley expressly stated that he was aware of his rights, that he did not want an attorney present, and that he had never asked for an attorney.[5]

Riley's testimony at the suppression hearing directly contradicted that of Detective DeLoatch. Riley said that he never "blurted" anything out concerning his innocence and that Detective DeLoatch always initiated the conversation. Riley also stated that when he checked "no" on the waiver form at 1:30 p.m., he meant that he "didn't want to talk without a lawyer."[6]

---

**5.** Riley was given something to eat at 9:00 p.m. after he said he was hungry. Detective DeLoatch did not recall hearing Riley ever ask for food earlier that day. Riley testified, however, that he did ask for food early in the day, but was rebuffed.

**6.** The court specifically discredited this statement and instead credited Detective De-

He admitted that he understood his rights as a result of a previous arrest on August 22, just a few weeks earlier. Riley also denied that he had asked to speak with Muhammad,[7] but he did admit that the two of them had a conversation at the police station, in the course of which Muhammad told him that he had confessed.

The trial court ruled that Riley's statement was admissible because "Riley at no time requested the assistance of an attorney during the period of custodial interrogation," and because the Prince George's County rights waiver form was ambiguous. The court relied on Riley's express written statement that he responded "no" to the question about whether he had ever requested a lawyer. Though he had invoked his right to remain silent earlier in the day by responding "no" to the ambiguous Prince George's County waiver of rights form, the court found that he made a voluntary, knowing, and intelligent waiver of his *Miranda* rights [8] at 1:40 p.m.

### 2. *Muhammad's Interrogation*

Muhammad was arrested during the early morning hours of September 9. Detective Troy Harding of the Prince George's County Police took him to the Prince George's County police station at approximately 8:05 a.m. He was then left alone in the interview room until 9:05 a.m., when Detective Harding came in and read Muhammad his rights. Muhammad said he was willing to make a statement without a lawyer present at that time, and stated that he did not know anything about the murders. He was then left alone again while the police questioned others. According to Detective Harding, Muhammad

did not appear to be distressed, did not complain, and was given a bathroom break.

At about 3:00 p.m., Detective Roger Irwin of the Prince George's County Police entered the interview room to speak with Muhammad. Detective Irwin, who had interviewed Marks earlier in the day, told Muhammad that other suspects had admitted involvement in the murders and had given up their weapons. When he asked Muhammad if he would also give up his weapon, Muhammad agreed to take the detective to the place where the weapon was. Muhammad then signed a consent-to-search form, and Detective Irwin took Muhammad to his mother's house to get his gun. On the way there, Detective Irwin asked Muhammad to confirm the waiver of his rights and had him sign another waiver of rights form. On the way back to the police station, Irwin took Muhammad to a "drive-through" fast-food restaurant to get him a hamburger, french fries, and a soft drink because Muhammad said he was hungry.

Irwin and Muhammad arrived back at the police station at approximately 4:30 p.m. Muhammad was then interviewed for the first time by District of Columbia officers, and in the course of those interviews he agreed to make a videotaped statement concerning his involvement in the murders. After the statement was taped, he was asked once again if he had been advised of his rights and if he would make a statement without a lawyer present. Muhammad confirmed that he had been advised of his rights and then gave a written statement in which he confessed again to the murders. Detective Irwin testified that

Loatch's testimony that immediately after Riley checked the box that said "no," he told Detective DeLoatch that he was willing to talk, but that he did not want to make a written statement.

7. The court also discredited this statement, crediting instead Detective DeLoatch's testimony that Riley specifically asked to speak with Muhammad.

8. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Muhammad appeared "very calm, relieved," and "remorseful" as he was writing his statement. Muhammad never gave any indication that he was unhappy with his treatment.

The trial court, after hearing this evidence,[9] concluded that Muhammad "was advised of his rights, and in writing made voluntary, knowing, and intelligent waiver of those rights, and agreed voluntarily to make a number of statements about both this offense and [other] offenses in Maryland."

### E. *The Confessions*

On the day that these appellants were arrested, each of them gave statements implicating himself and his two co-defendants in the shooting of the Littles brothers. All three appellants moved for severance and for suppression of their co-defendants' statements on *Bruton* grounds. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The government argued that each confession could come in against the confessing appellant as a statement of a party opponent and that all the confessions could be admitted against co-defendants as statements against penal interest. The court ruled, however, that each confession would be admissible only against the particular individual who made it.

Following a lengthy discussion, the court and the parties agreed that the prosecutor would have each appellant's statement retyped, deleting any references to co-defendants and substituting the pronoun "I" wherever the pronoun "we" appeared in any of the statements. Appellants were permitted to raise additional concerns and were accommodated by the court when they suggested other changes or redactions. After all of the redactions were completed, the defense attorneys did not make any further objections, nor did they suggest any other changes.

At trial the statements, as redacted, were read to the jury. The prosecutor read the portions of each statement that corresponded to the detectives' questions, and the testifying detectives read the answers. Before the reading of each statement, the court instructed the jury to consider it only in determining the guilt or innocence of the confessing defendant and not as it related to any of the co-defendants. These instructions were repeated twice more during the trial.

### 1. *Muhammad's Statement*

Muhammad's redacted confession, as read to the jury, contained references to Marks' house and Muhammad's presence at Marks' house on the night of the shooting:

Q. Okay, Mr. Muhammad, we're investigating an incident that happened on August 20th, at about 9:30, on Pennsylvania Avenue, the 3800 block of Fairfax Village. It was on a Tuesday evening at about 9:30. Could you tell us what happened that particular night?

A. I went over there and I had my deuce-deuce. I had turned around and seen these two guys, three dudes. They were standing on Pennsylvania Avenue. They were down by, I think it was by a bank. They were leaning up against a wall. So I seen them. So I knew that since they were out, that they was with Fairfax Village because they were out there. I hopped out of the car and hopped out of the car with my gun. I chased them. And they laid in the grass. And I just started shooting. That's all that happened. Then I ran back and jumped in the car and went back down Pennsylvania Avenue. But if—but if I had known that the 12 year old, that young, I would not have shot

9. Muhammad did not testify at the suppression hearing.

him because I didn't know he was that young. I really—I couldn't really see because it was dark outside and I was looking from a distance.

And when I got out of the car, they ran around the corner. I still couldn't tell because they were running around the corner. But when they ran on the grass, I still couldn't tell. That was— that it was happening so fast.

Q. Okay. Let's go back to where you came from over on Gaylord. Where were you before you got to Pennsylvania Avenue?

A. Just standing on Gaylord.

Q. You got a particular place on Gaylord?

A. No, I was outside for a while, then I was at Tony's house for a minute. But then I just went outside for a while. Then I left from outside.

Q. Okay, you mentioned something about another Tony.

A. Yeah, Tony, I don't know his last name. I just know Tony. Lives on Brookfield.

Q. Brookfield. Okay. Where on Brookfield, do you know?

A. At the top.

Q. The top. Does he have any family members that you know of?

A. He got a sister.

Q. A sister. You know his sister's name?

A. I think her name is Sherry.

Q. Okay. So that Tony was with you?

A. Yeah.[10]

Q. Okay. And what did he do on Pennsylvania Avenue, do you remember?

A. He had the one shot. And he— he ain't really get out. He got out of

the car. I think he shot it. But he ain't shoot nobody because he was like too— too far back. And then when he shot, I guess it just hit that—probably the one that hit the sign or whatever, the Fairfax Village sign or whatever.

Q. After you come back from the shooting, where—where did you go from there?

A. Came back from the shooting, I went and put my gun in my house. Then I stayed in for a while and then I came back down.

Q. Did you ever go back to Tony's house on Gaylord Drive that night?

A. I don't think that I remember. I think probably I did. I don't know. I can't really remember what I did. But I know I went home and put my gun in the house. Then I came back down later that night.

Q. Do you remember going inside of his house or watching TV?

A. No, because there was—matter of fact, I remember because I took my gun in the house and then I went and burnt the car. I went to burn the car. Then I was standing out on Brookfield.

### 2. *Marks' Statement*

Marks' statement described the events of August 20:

Tuesday night I got into a little blue car. Started driving around D.C. or whatever and went onto Pennsylvania Avenue at Fairfax shopping center. So James [Stroman] pulled up to the parking lot, turned around and parked. I jumped out, ran to the grass, started shooting. I then jumped back into the car and came back around the way.

\*　　\*　　\*　　\*　　\*　　\*

---

**10.** "Tony from Brookfield," who according to Muhammad's statement was present at the shootings, was James Stroman. "Tony from Gaylord," whose presence at the scene was

not mentioned by Muhammad, was appellant Marks. This distinction was made clear to the jury promptly after the reading of the statement.

[James was] looking out the window, then he pulled out the short joint and he shot it off because I remember hearing a boom.

\*    \*    \*    \*    \*    \*

Then he started yelling, get in the car, get in the car.

When Marks was asked how he knew to go back to the car, he replied, "Tony ... Tony James started yelling ... Get in the car, get in the car." Marks also stated that James Stroman drove him to his (Stroman's) home on Gaylord Drive.

### 3. *Riley's Statement*

Riley's statement described the events of August 20:

I was at Tony's house earlier that day. The people from Fairfax tried to run me down. They jumped out of their car with their guns and chased me.

\*    \*    \*    \*    \*    \*

I had a .38 caliber and James [Stroman] had the sawed-off shotgun.

I was just riding. I seen some dudes sitting outside. James pulled the car in the shopping center, made a U-turn, and stopped. I got out of the car. James got out of the car and ... stood by the car door.

I tried my gun and it got jammed. I tried to unload it but could not. Then I ran back to the car. I got into the car and went back to Maryland to Tony's house. I got into the Spectrum ... drove it to D.C. and burned it.

### II. Riley's Contentions

#### A. *Riley's Sixth Amendment Right to Counsel*

■ Riley asserts that his Sixth Amendment right to counsel had already attached when he was arrested during the early morning hours of September 9 because the government had filed a criminal complaint charging him with first-degree murder in order to obtain an arrest warrant on September 7. Relying on this assertion, Riley maintains that he should have been informed by the police that a lawyer had telephoned the police station on his behalf before the police made any further attempts to question him. These arguments fail because, under controlling Supreme Court precedent, Riley's Sixth Amendment right to counsel had not yet attached when he was arrested on September 9.

■ It has been settled law for thirty-five years that a person's Sixth Amendment right to counsel attaches only "at or after the time that adversary judicial proceedings have been initiated" against that person "by way of formal charge, preliminary hearing, indictment, information or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 688–689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *accord, e.g., United States v. Gouveia*, 467 U.S. 180, 187, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984); *United States v. Moore*, 122 F.3d 1154, 1156 (8th Cir.1997); *see United States v. Duvall*, 537 F.2d 15, 18–19 (2d Cir.1976). Riley contends nevertheless, relying on D.C.Code § 23–113(c)(3) (2001), that as soon as an Assistant United States Attorney filed a complaint charging him with murder to obtain an arrest warrant on September 7, the government had committed itself to prosecuting him, and he was "faced with the prosecutorial forces of organized society." *Kirby*, 406 U.S. at 689, 92 S.Ct. 1877.

There is no denying that D.C.Code § 23–113(c)(3) does state that the "prosecution" of an individual commences with the filing of a complaint to obtain an arrest warrant.[11] However, obtaining an arrest warrant has never been deemed to be the point at which the Sixth Amendment right

---

11. D.C.Code § 23–113(c)(3) provides that "[a] prosecution is commenced when ... a com- plaint is filed before a judicial officer empowered to issue an arrest warrant."

to counsel attaches. *Kirby*, 406 U.S. at 689, 92 S.Ct. 1877; *see Gouveia*, 467 U.S. at 190, 104 S.Ct. 2292 (stating that the Sixth Amendment right to counsel has never been held to attach at the time of arrest); *Beck v. Bowersox*, 362 F.3d 1095, 1102 (8th Cir.2004) ("this court and other circuits have repeatedly held that the [Sixth Amendment right to counsel] does not attach with an arrest, [or] even an arrest preceded by the filing of a complaint"); *State v. Beck*, 687 S.W.2d 155, 160 (Mo.1985) (stating that an arrest warrant is not a "formal charge" as that term is used in *Kirby* ); *see also Martinez v. United States*, 566 A.2d 1049, 1051–1052 (D.C.1989) (grand jury indictment of the defendant was the first "formal charge" against him even though arrest warrants had previously been issued).

■ The Sixth Amendment right to counsel "attaches only at or after the time that adversary judicial proceedings have been initiated against [the defendant]." *Kirby*, 406 U.S. at 689, 92 S.Ct. 1877 (citations omitted). Though filing a complaint to obtain an arrest warrant involves criminal charges, these are not the same "formal" charges of which *Kirby* speaks. The phrase "charged by the United States attorney" has different meanings in different contexts. *See Marrow v. United States*, 592 A.2d 1042, 1046 n. 9 (D.C.1991). If this court were to hold that the Sixth Amendment right to counsel attaches when the government files a complaint to obtain an arrest warrant, "we would be granting greater protection to persons arrested with warrants than without, thus discouraging the use of warrants in making arrests." *Moore*, 122 F.3d at 1156; *see*

*Duvall*, 537 F.2d at 18–19. Moreover, "holding that . . . the issuance of an arrest warrant is akin to the initiation of adversary judicial proceedings would result in swinging the pendulum of criminal justice far too distant from society's interest in effective and meaningful criminal investigations." *State v. Beck*, 687 S.W.2d at 160. Thus we conclude that the filing of a complaint containing a criminal charge in order to obtain an arrest warrant does not give rise to the Sixth Amendment right to counsel. What matters is "the initiation of adversary *judicial* criminal proceedings— whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby*, 406 U.S. at 689, 92 S.Ct. 1877 (emphasis added); *accord, e.g., United States v. Rorie*, 518 A.2d 409, 412– 413 (D.C.1986) (citing *Kirby* ).

Because no "adversary judicial criminal proceedings" were initiated against Riley until after September 9, no Sixth Amendment right to counsel had attached on September 9, the date on which he was arrested. The police therefore had no obligation to inform Riley that they had received a telephone call on September 9 from someone claiming to be his attorney or to terminate their interrogation. *See Moran v. Burbine*, 475 U.S. 412, 422–423, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (police are not required under the Sixth Amendment to inform a suspect of his attorney's efforts to reach him (citing, *inter alia, Kirby* and *Gouveia* )). The trial court was correct when it ruled that the police were not constitutionally required to suspend their interrogation of Riley when they received the call from Mr. O'Brien, or even to advise him of Mr. O'Brien's call.[12]

---

**12.** This case differs from *Moran v. Burbine* in that it involves "no" answers on the waiver of rights card as well as an available attorney. That distinction cannot be decisive here, however, because by the time the attorney's availability became known, Riley had

already indicated to Detective DeLoatch that he was willing to talk (he just did not want to give a *written* statement) and had changed his "no" on the waiver of rights form to "yes."

We recognize that there are several state court decisions that do not accept the holding

## B. *Riley's Fifth Amendment Rights*

### 1. *Riley's Right to Counsel*

■ Riley argues that he invoked his Fifth Amendment right to counsel at 9:00 a.m. on September 9, during the initial interrogation by Detectives Sauls and Garvey, when he checked "no" in the box next to the question "Do you want to make a statement at this time without a lawyer?" on the Prince George's County rights waiver form. The trial court found, however, that he did not invoke his Fifth Amendment rights at that time, and there is evidentiary support for its finding.

■ Under case law interpreting the Fifth Amendment, custodial interrogation must cease if, at any time during the questioning, the suspect clearly and explicitly requests an attorney. *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *Edwards v. Arizona*, 451 U.S. 477, 484–485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). If the suspect clearly requests an attorney, interrogation may lawfully resume only if the suspect "initiates further communication, exchanges or conversations with the police." *Edwards*, 451 U.S. at 485, 101 S.Ct. 1880. However, the Supreme Court has stated that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not

require the cessation of questioning." *Davis*, 512 U.S. at 459, 114 S.Ct. 2350 (emphasis in original; citations omitted).[13] Police officers have no duty to clarify ambiguous statements that might arguably contain a request for an attorney. *Id.* at 461–462, 114 S.Ct. 2350; *see United States v. Cooper*, 85 F.Supp.2d 1, 20 (D.D.C.2000). A court, moreover, must consider the totality of the circumstances "to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel." *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

The trial court found, as a fact, that Riley did not explicitly invoke this right when he answered "no" to the question "Are you willing to make a statement at this time without a lawyer?" The court interpreted this "no" answer as clearly invoking his right to remain silent, but not his right to an attorney under the Fifth Amendment. In explaining its finding, the court said that "when a person answers no to the [question of whether he is willing to make a statement without a lawyer], it is impossible to know whether the person . . . is not willing to make a statement without a lawyer but is willing to make a statement with a lawyer or whether the person is not willing to make a statement." The Prince George's County waiver form, the court said, was "inherently ambiguous." [14] The court noted that Riley did not explicitly

---

of *Moran v. Burbine*. *See State v. Cobb*, 251 Conn. 285, 559–561 & n. 3, 743 A.2d 1, 151–153 & n. 3 (1999) (Katz, J., dissenting) (collecting cases). These decisions, however, are all based on state constitutions, whereas only the United States Constitution—as interpreted and applied in *Moran*, as well as the *Kirby* and *Gouveia* line of cases—governs cases in the District of Columbia. *See Bolling v. Sharpe*, 347 U.S. 497, 498–499, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

**13.** In *Davis* the Court held that a defendant's comment one and a half hours into an inter-

rogation, "maybe I should talk to a lawyer," was not sufficiently clear to establish that he had invoked his right to counsel. 512 U.S. at 459, 114 S.Ct. 2350.

**14.** In this case the ambiguity was in the question posed on the rights card and not, as in *Davis*, in the defendant's statement. This makes no difference in the result, however, since Riley admitted that he did not ask for a lawyer.

ask for a lawyer at any time on September 9, and when he was specifically asked late in the day on September 9 whether he had *ever* requested a lawyer that day, he responded "no." Riley further demonstrated that he did not ask for a lawyer when, at 1:43 p.m. on September 9, he again answered "no" upon being asked whether he was willing to make a statement without a lawyer, but clarified that statement by saying to Detective DeLoatch, "I don't want to make a written statement, but I'm willing to talk to you." Taking all of these facts into consideration, we hold that Riley failed to invoke his right to counsel under the Fifth Amendment. *See Gresham v. United States*, 654 A.2d 871 (D.C.1995) (holding that defendant's confession to the police need not be suppressed because defendant did not clearly assert his right to counsel during interrogation when he asked his girl friend, in the presence of the police, to call his mother and tell her to get him a lawyer).[15]

### 2. *Riley's Waiver of the Right to Remain Silent*

There is no doubt that Riley invoked his right to remain silent at 9:00 a.m. on September 9. The issue before us here, however, is whether he waived that right a few hours later, at 1:43 p.m. on September 9.

■ "The admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was scrupulously honored."

*Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). In *Stewart v. United States*, 668 A.2d 857 (D.C. 1995), this court listed four factors, originally set forth in *Mosley*, that must be considered in determining whether a suspect's rights have been "scrupulously honored":

(1) was the suspect orally advised of his rights and did he orally acknowledge them; (2) did the police immediately cease questioning and make no attempts to resume or ask him to reconsider; (3) was there a sufficient break (in *Mosley*, two hours) between the first and second interrogations and was the second performed at a different location by a different officer about a different crime and (4) were *Miranda* warnings given before the second questioning session.

*Mosley*, 423 U.S. at 104, 96 S.Ct. 321; *see Stewart*, 668 A.2d at 863. "The *Mosley* Court envisioned a case-by-case approach involving an inquiry into all of the relevant facts to determine whether the suspect's rights have been respected." *United States v. Dell'Aria*, 811 F.Supp. 837, 842 (E.D.N.Y.1993) (cited in *Stewart*, 668 A.2d at 863).

■ In reviewing a trial court's denial of a motion to suppress evidence, this court may not disturb the trial court's findings of fact if they are supported by substantial evidence. *E.g., Stewart*, 668 A.2d at 863; *see* D.C.Code § 17–305(a) (2001). However, we review *de novo* whether the defendant's rights were "scru-

---

**15.** *Tindle v. United States*, 778 A.2d 1077 (D.C.2001), does not support Riley's argument. In *Tindle*, which involved the same Prince George's County rights waiver form as the one that was used here, the defendant checked "no" when asked whether he wanted to make a statement without an attorney, just as in this case. The two cases can be distinguished on their facts, however, because in *Tindle*, unlike the instant case, there was no evidence suggesting that the defendant did

not request an attorney, and the government in *Tindle* did not contest the defendant's claim that he had requested an attorney.

*Wantland v. State*, 49 Md.App. 636, 435 A.2d 102 (1981), can be distinguished on the ground that it is a pre-*Davis* decision. The standard for determining whether a defendant has invoked his right to counsel has become considerably more explicit since *Davis*.

pulously honored" and whether the police conduct constituted "interrogation" because these are questions of law. *Jones v. United States*, 779 A.2d 277, 281 (D.C. 2001) (en banc), *cert. denied*, 535 U.S. 906, 122 S.Ct. 1207, 152 L.Ed.2d 145 (2002); *Stewart*, 668 A.2d at 863.

█ The trial court ruled that "with one failing, which I find to be inadvertent, the police did scrupulously honor [Riley's] right to remain silent ... having invoked his right to remain silent at 9:00 a.m. that morning and having decided to waive his rights at 1:30 or 1:43 that same afternoon." In coming to this decision, the court reviewed the events of September 9 following Riley's arrest. The court first noted that the police properly terminated their questioning when Riley invoked his right to remain silent at 9:00 a.m. However, Detective DeLoatch then improperly entered Riley's interview room at 10:45 a.m. with the express purpose of eliciting a statement from Riley and interrogating him. Though this was not a proper re-initiation of questioning under *Michigan v. Mosley*, the trial court concluded, and we agree, that under the totality of the circumstances this isolated act did not invalidate Riley's subsequent waiver of rights or make his confession inadmissible.

In *Peoples v. United States*, 395 A.2d 41 (D.C.1978), the defendant was arrested in Maryland at 9:00 a.m. and thereafter invoked his rights. Despite this invocation, improper questioning ensued, and the defendant admitted to past criminal involvement in the District of Columbia and gave a written confession. Six hours after making this confession, the defendant was again informed of his rights by a magistrate, and he indicated that he understood them. He was then taken back to the police station, where he asked to speak to a District of Columbia police officer. This officer again read the defendant his rights, and the defendant waived them, giving a four-page written statement on the crimes he had committed, signing each page, and initialing a further waiver of his *Miranda* rights. Though the defendant's initial confessions early in the day were inadmissible, this court held that the trial court did not err in finding appellant's subsequent confession to be voluntary and untainted. 395 A.2d at 44. Although the defendant in *Peoples* was interviewed about the same crime after invoking his right to remain silent, we held that under the totality of the circumstances the *Mosley* requirements were satisfied, and thus the statements were admissible.

█ In the case at bar, we are satisfied that, under the totality of the circumstances, the *Mosley* requirements, as applied in *Peoples*, were met.[16] Riley invoked his right to remain silent at 9:00 a.m., and the questioning was immediately terminated. Riley was then left alone for a substantial period of time, more than four hours, except for the brief improper remarks that Detective DeLoatch directed at Riley at 10:45 a.m. Later, while Riley was being escorted to the bathroom at around 1:30 p.m., he initiated a conversation on the subject of the murders by making statements to Detective DeLoatch about his innocence which the detective described as unsolicited "outbursts."[17] After returning from the bathroom with

---

16. The facts of the present case stand in stark contrast to the facts of *Stewart*, in which the defendant's right to remain silent was not "scrupulously honored" but was violated on four separate occasions. *See* 668 A.2d at 867. In addition, the defendant in *Stewart* never initiated the resumption of the discussion about the crimes for which he had been arrested, as Riley did in the instant case.

17. Although we cannot totally eliminate the possibility that Detective DeLoatch solicited these "outbursts" through his 10:45 a.m. comments to Riley, we are satisfied, as was the trial court, that any arguable taint was

Riley and hearing his "outbursts" continue, DeLoatch correctly understood that Riley wished to speak further on the subject. Detective DeLoatch then read Riley his *Miranda* rights and gave him a waiver form listing these rights, asking if he waived them. After checking the "no" box next to the question, "Are you willing to make a statement at this time without a lawyer?", Riley, *without prompting,* orally clarified that he was willing to talk but did not want to make a *written* statement.[18] After Detective DeLoatch explained to Riley that answering "yes" would not result in a written statement but would simply allow him to talk about the murders, Riley changed his answer from "no" to "yes" and waived his rights.[19] During the ensuing conversation Riley told Detective De-Loatch that he had nothing to do with the murders for which he had been arrested.

After leaving Riley alone for another long stretch, Detective DeLoatch returned to complete the processing of Riley's arrest. While this was going on, Riley initiated a conversation with Detective De-Loatch by asking if he could speak with Muhammad. Detective DeLoatch arranged a meeting between the two of them at about 7:30 p.m., and during that meeting Riley learned from Muhammad that he had confessed. Riley then decided that he too wanted to confess, and told Detective DeLoatch that he wanted to tell his side of the story. Riley then gave a written statement, in the course of which he admitted his involvement in the murders. Although he was not read his *Miranda* rights again before writing that statement, which was

completed at around 9:40 p.m., the evidence established that he had already heard his rights read several times that day. In addition, he testified at the suppression hearing that he understood his rights because of his prior arrest on August 22, only two and a half weeks earlier. Finally, Riley signed an addendum at the end of his written statement, indicating that he waived his rights and that at no time that day had he requested the aid of counsel.

The timing of Riley's confession persuades us that the key factor in prompting him to confess was his 7:30 p.m. meeting with Muhammad, which was arranged at Riley's behest. We hold that Riley's waiver of his *Miranda* rights shortly after 1:30 p.m. was not tainted by Detective De-Loatch's serious, but ultimately inconsequential, misstep at 10:45 a.m., and that his written confession several hours later—which he gave *after* his meeting with Muhammad—was not subject to exclusion under *Mosley* and its progeny.

### C. *Riley's Sixth Amendment Right of Confrontation*

▆▆ At this court's request, all of the parties filed supplemental memoranda after oral argument discussing the effect on this case of the recent Supreme Court decision in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In his memorandum, Riley asserts that *Crawford* represents "a course correction" and that, taken together with *Bruton,*[20] *Gray,*[21] and *Cruz,*[22] the *Crawford* opinion "demonstrates a significant shift in the Supreme Court's jurisprudence con-

---

dissipated by the lengthy break—almost three hours—between the 10:45 comments and the 1:30 conversation.

18. At no time did Riley tell Detective De-Loatch that he had already filled out the same waiver of rights form earlier in the day.

19. At the suppression hearing, the trial court found that this waiver by Riley was knowing, intelligent, and voluntary. There is, more-

over, nothing in the record to suggest that the waiver was coerced or involuntary.

20. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

21. *Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998).

22. *Cruz v. New York,* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987).

cerning the admissibility in joint trials of police obtained confessions." Although we agree that the *Crawford* case "dramatically transformed Confrontation Clause jurisprudence," *Thomas v. United States*, 914 A.2d 1, 5 (D.C.2006), we think Riley reads the *Crawford* opinion too broadly.

Initially, Riley relies on *Cruz* to argue that all three appellants' confessions in this case were not properly sanitized under *Gray* (and *Bruton*). He asserts that "[the] jurors only needed to insert the word 'we' for 'I' to conclude that Mr. Muhammad and Mr. Marks implicated Mr. Riley in their statements, and the interlocking nature of the statements was an open invitation to do so." *Cruz* does not support this argument.

In *Cruz* a co-defendant's confession was held to be inadmissible, even though the defendant against whom it was admitted had confessed as well, because it was unredacted. *Cruz*, 481 U.S. at 193, 107 S.Ct. 1714. In the present case, by contrast, the confessions of Muhammad and Marks were redacted to eliminate any mention of Riley. Furthermore, in *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), decided on the same day as *Cruz*, the Supreme Court clarified that if the prosecution in *Cruz* had redacted the confession to remove any mention of the co-defendant, there would have been no Confrontation Clause problem. *See Richardson*, 481 U.S. at 211, 107 S.Ct. 1702. Because the co-defendants' confessions in this case were redacted to omit any mention of Riley, *Cruz* does not apply.

■ Riley also contends that the inferences that could be drawn from the "interlocking" nature of Marks' and Muhammad's statements violated his Sixth Amendment right of confrontation. This contention fails under established Supreme Court precedent. In *Richardson* the Court instructed that, when determining whether a confession expressly implicates a co-defendant, courts should restrict their examination to determining whether the confession is "incriminating on its face" and should not consider whether it is incriminating "when linked with evidence introduced later at trial." *Richardson*, 481 U.S. at 208, 107 S.Ct. 1702; *see Plater v. United States*, 745 A.2d 953, 960–962 nn. 11 & 12 (D.C.2000) (noting that the Supreme Court in *Gray* "ruled out the consideration of other evidence when determining whether a statement inferentially incriminates a defendant"). Inferences that are considered offensive to *Bruton's* principles are those that allow the jury to infer *from the redactions themselves* that the co-defendant was a part of the criminal enterprise, "even were the confession the very first item introduced at trial"—such as using the word "deleted" instead of a specific individual's name, which "obviously refer[s] directly to someone." *Plater*, 745 A.2d at 961 n. 11. Nothing like that happened in this case. An examination of Muhammad's and Marks' statements, as admitted into evidence, reveals that they were properly redacted and did not implicate Riley, standing alone; thus the statements, as admitted, did not violate the teachings of *Bruton* and its progeny.

■ Riley also relies on *Crawford* to argue that the introduction of his co-defendants' confessions violated the Confrontation Clause of the Sixth Amendment. In *Crawford* the Supreme Court held that the admission of an out-of-court "testimonial" statement by the defendant's wife which incriminated her husband infringed his Sixth Amendment rights because he did not have a prior opportunity to cross-examine her. *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354.[23] The wife's statement "was

---

23. The wife "did not testify because of the state marital privilege, which generally bars a

spouse from testifying without the other

both facially incriminating and introduced against the defendant challenging the statement." *United States v. Cuong Gia Le,* 316 F.Supp.2d 330, 338 (E.D.Va.2004). Here, by contrast, the confessions of Riley's co-defendants were redacted to eliminate all references to the other defendants' participation in the murders; thus they could not facially incriminate Riley. Furthermore, those statements were not admitted as evidence against Riley.

*Crawford,* therefore, is not pertinent to Riley's appeal, because Marks' and Muhammad's confessions were properly redacted in accordance with *Bruton, Richardson, Gray,* and *Plater.* In addition, the court gave a proper limiting instruction to resolve any questions that the jurors might have had about how the statements could be used. *See Richardson,* 481 U.S. at 211, 107 S.Ct. 1702. Thus Riley had no right based on the *Bruton* line of cases, or on *Crawford,* to confront his co-defendants through cross-examination because their statements did not implicate Riley's Confrontation Clause rights.

### III. MARKS' CONTENTIONS

■ Marks argues that his right of cross-examination under the Confrontation Clause of the Sixth Amendment was violated by "the improper admission of statements by a non-testifying co-defendant," namely Muhammad. Specifically, Marks challenges the introduction of Muhammad's redacted confession, which contains references to Marks' house, and to Muhammad's presence at Marks' house, on the night of the shooting.

Muhammad's statement referred to two different persons named Tony—"Tony" James Stroman, the driver of the car in which the defendants traveled to and from the scene of the shooting, and "Tony" Antonio Marks (appellant), to whose house Muhammad went after the shooting. The distinction between these two "Tonys" was made clear to the jury after the statement was read. Muhammad's statement did not mention or describe any participant in the shootings other than himself and the driver of the car, "Tony" Stroman. No implication was made that the "Tony" who lived on Gaylord Street—appellant Marks—participated in the shooting. In fact, Muhammad's statement, on its face, seems to suggest that while Muhammad was shooting at the Littles brothers, Marks was at his home in Maryland. Muhammad's statement was therefore not incriminating on its face. It probably became incriminating when it was linked to other evidence presented at trial, but under established precedent from the Supreme Court and this court, such linkage does not violate the Confrontation Clause. *Richardson,* 481 U.S. at 208–209, 107 S.Ct. 1702; *Gray,* 523 U.S. at 195–196, 118 S.Ct. 1151; *Plater,* 745 A.2d at 960–961 & n. 11.

■ In his supplemental memorandum, Marks argues that "the meaning and rationale of *Crawford* nullifies the *Richardson v. Marsh* edict that statements that are only incriminating through linkage to other evidence is not a violation of the Confrontation Clause." But *Crawford* does not even mention *Bruton* or any of

---

spouse's consent." *Crawford,* 541 U.S. at 40, 124 S.Ct. 1354 (citation omitted). Her statement had been tape-recorded, however, and that recording was played for the jury to hear.

We note that the marital privilege in the District of Columbia is different. Here, one spouse is "competent but not compellable to testify for or against the other." D.C.Code § 14–306(a) (2001). The privilege may be invoked only by the spouse who is called to testify, not by the defendant who wishes to keep his or her spouse off the witness stand. Thus a husband cannot prevent his wife from testifying against him (except as to "confidential communications made by one to the other," § 14–306(b)) if she is willing to do so. *See generally Postom v. United States,* 116 U.S.App. D.C. 219, 322 F.2d 432 (1963).

the later cases which followed it and applied its teaching. Consequently, Marks' contention that this court should in effect overrule *Richardson* through its application of *Crawford* must be rejected because only the Supreme Court can overrule its own cases. *E.g., Agostini v. Felton,* 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).[24] Marks cites no authority to support his assertion that *Crawford* overrules or supersedes *Richardson,* and the limited authority that does exist is to the contrary. *See, e.g., Cuong Gia Le,* 316 F.Supp.2d at 338. Thus, as to Marks, we find no Sixth Amendment violation and no ground for reversal.

### IV. MUHAMMAD'S CONTENTIONS

#### A. *Muhammad's Claim of Coercion*

■ Muhammad contends that his waiver of rights was coerced because he was deprived of food for ten hours and was "unable to walk around for nearly nine hours." The flaw in this argument is that there was no evidence that Muhammad waived his rights as a result of any coercion.

After Muhammad was arrested at approximately 7:30 a.m., he was taken to the police station and placed in an interview room. Shortly after 9:00 a.m. two detectives entered the room, read Muhammad his rights, and gave him a waiver of rights form to fill out. Muhammad waived his rights and gave a statement denying knowledge of the events associated with the charges. He was then left alone in the interview room for several hours. During this lengthy break in Muhammad's interrogation, the police periodically checked on

him. Muhammad never said he was hungry or in any kind of distress; he was also escorted to the bathroom at least once.

We are satisfied that this delay in Muhammad's interrogation did not, in itself, give rise to a coercive atmosphere. In the first place, Muhammad waived his rights at the outset. *See United States v. Bell,* 740 A.2d 958, 964–966 (D.C.1999); *Byrd v. United States,* 618 A.2d 596, 598–599 (D.C. 1992). There was no evidence that the police threatened Muhammad or used physical force on him; in fact, Muhammad confirmed that no such abuse occurred. Muhammad knew how to read and write, had attended school through the tenth grade, and stated that he understood his rights. In addition, he was not under the influence of drugs or alcohol at any time during the interrogation. Overall, Muhammad never gave any indication that he was unhappy with the way he was treated following his arrest.

Nor was there any evidence to suggest that, after the interrogation resumed later in the day, Muhammad's confessions were coerced. Detective Irwin entered the interview room at 3:00 p.m. to resume his earlier conversation with Muhammad. The detective told him that other persons had admitted their involvement in the murders and had given up their weapons; he simply asked Muhammad if he would do the same. Muhammad agreed, and on the way to his mother's house to retrieve the weapon, he reaffirmed that he knew his rights and that he had waived them. After the gun was recovered, Detective Irwin took Muhammad to a fast-food restaurant at 4:30 p.m. to get something to eat. Upon

---

24. The Supreme Court held in *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989):

> If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of deci-

sions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.

*Id.* at 484, 109 S.Ct. 1917, cited with approval in *Agostini,* 521 U.S. at 237, 117 S.Ct. 1997.

their return to the police station, Muhammad gave videotaped and written confessions. Before making these confessions, he was again read his rights, and again he confirmed that he understood and waived them. The evidence shows that Muhammad was not subjected to any coercion that might render his statements inadmissible. His interrogation cannot be characterized as coercive simply because it extended—intermittently—over a period of several hours. *See, e.g., Everetts v. United States,* 627 A.2d 981, 986 (D.C.1993) (sixteen-year-old defendant voluntarily, intelligently, and knowingly waived his rights, though he was detained for a lengthy period of time prior to questioning).

Taking all of the circumstances into account, we hold that the trial court properly determined that Muhammad's confessions were not coerced. *See Byrd,* 618 A.2d at 599.

### B. *Muhammad's Motion to Sever*

■ Muhammad argues that the trial court erred in denying his motion to sever his case from those of Marks and Riley and that the supposedly "conflicting defenses" of the defendants and the disparity of proof as to his guilt, compared with the proof against Marks and Riley, resulted in manifest injustice. For three reasons, we hold that the trial court properly exercised its discretion in denying Muhammad's request for severance. First, the murders were jointly committed by all three co-defendants; second, the evidence was substantial against each defendant; and third, the record reveals no manifest prejudice to Muhammad (or either of the other defendants, for that matter) resulting from their joinder in a single trial.

■ We review the denial of a motion to sever for abuse of discretion. *E.g., Ingram v. United States,* 592 A.2d 992, 996 (D.C.1991). When multiple defendants are charged with jointly committing a criminal offense, "there is a strong presumption that they will be tried together." *Id.; see* Super. Ct.Crim. R. 8(b). Properly joined defendants may request a severance at any time under Super. Ct.Crim. R. 14 if trying the defendants together "prejudices any party." *Ray v. United States* 472 A.2d 854, 856 (D.C.1984); *accord, Ingram,* 592 A.2d at 996. Severance is not called for, however, when co-defendants simply blame each other and are mutually hostile to one another. "Rather, severance is required only when a defendant shows that (1) a clear and substantial contradiction between the respective defenses' causes inherent irreconcilability between them and (2) that the irreconcilability creates a danger that the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty." *Id.* (emphasis added; citations and internal quotation marks omitted). A court should grant a severance "only if there is a serious risk that a joint trial could compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).

■ Muhammad's argument is essentially that he was prejudiced because his co-defendants attempted to shift responsibility for the crimes to him. We find no merit in this argument. "Unfair prejudice does not arise merely because defendants are mutually hostile and attempt to blame each other." *Ingram,* 592 A.2d at 996. We find nothing in the record that would support Muhammad's claim that his co-defendants asserted defenses that were irreconcilable with his. Furthermore, none of the three appellants testified at trial. All of the evidence heard by the jury came from witnesses whose testimony would be admissible in separate trials. The court also limited the effectiveness of the blame-

shifting theory of Muhammad's co-defendants by giving jury instructions to limit the impact of any suggestion by Riley's and Marks' counsel that Muhammad was the leader of the assault on the two Littles brothers. We are fully satisfied that the trial court did not abuse its discretion, or otherwise err, in denying the motion for severance.[25]

### C. *Limiting the Scope of Cross–Examination*

■■■ Muhammad contends that the trial court improperly prevented his counsel from asking a series of questions during his cross-examination of Wayne Brown about whether Brown knew if anyone had been prosecuted for shooting two members of the Rushtown Crew. This claim was not raised in the trial court, however, and we find no plain error in the court's handling of the matter.

■■■■ "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *see Springer v. United States,* 388 A.2d 846, 857 (D.C. 1978). If the trial court has permitted "enough cross-examination on an appropriate issue to satisfy the Sixth Amendment," any limitation on further cross-examination will be reviewed on appeal only for abuse of discretion. *Stack v. United States,* 519 A.2d 147, 151 (D.C.1986). In exercising that discretion, the court must balance the "importance of the subject

matter" and the credibility of the witness against the "degree of cross-examination permitted." *Id.*

In this case, Muhammad's counsel sought to demonstrate through cross-examining Brown that members of the Rushtown Crew shot at the Littles brothers to avenge the wounding of Russell Tyler and the murder of Lawrence Lynch. The trial court prohibited this line of questioning because it was irrelevant and did not suggest a justifiable motive for the killing. The court noted that the only inference to be drawn from such questions would be that the murder of the Littles brothers "was some sort of justice," which of course could not excuse or justify a double homicide.

■■■ On appeal, Muhammad argues "that if the Rushtown Members knew that the attackers of their friends were being prosecuted, the government's evidence of motive would be greatly discredited." Because this argument was not raised below, Muhammad must demonstrate plain error in order to win reversal. "Under the plain error standard of review, the appellant bears the burden of first establishing error, a deviation from the legal rule, and second, demonstrating that the error was so plain that the judge was derelict in countenancing it." *McCullough v. United States,* 827 A.2d 48, 55 (D.C.2003); *see United States v. Olano,* 507 U.S. 725, 732–734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). We find no plain error—indeed, we find no error at all—because there was substantial evidence of Muhammad's guilt, including most obviously his own state-

---

25. Muhammad's "disparity of the evidence" argument is wholly without merit. Severance may be warranted if there is a disparity in the evidence *and* if the evidence against one defendant is *de minimis* as compared with the

evidence against his co-defendants. *Russell v. United States,* 586 A.2d 695, 699 (D.C.1991). The evidence against Muhammad in this case plainly cannot be characterized as *de minimis.*

ment in which he confessed to the murders.

### D. *Muhammad's Sixth Amendment Right of Confrontation*

In his supplemental memorandum, Muhammad argues that the redaction of Riley's and Marks' confessions was inadequate. "It is utter fantasy," he asserts, "to suggest that the jury in this case, having heard directly from witnesses ... that the co-defendants were present together and acted together ... failed to detect the fictional revision of each defendant's confession turning each 'we' to 'I.'" This is essentially the same argument made by Riley, which we have already held to be deficient. Improper inferences from a confession are those which a jury can immediately draw "even were the confession the very first item introduced at trial." *Gray,* 523 U.S. at 196, 118 S.Ct. 1151. Inferences of guilt that arise "when the statement is linked with other evidence presented at trial," however, are not the type of inferences with which *Bruton* and its progeny are concerned. *See Plater,* 745 A.2d at 960. In this case the record makes clear that the statements of Riley and Marks were properly redacted and, standing alone, did not implicate Muhammad; thus those statements as admitted did not violate Muhammad's Sixth Amendment rights.[26]

V. CONCLUSION

For the foregoing reasons, appellants' convictions are all

*Affirmed.*

---

26. Muhammad also maintains that the prosecutor urged the jurors to "note how the confessions 'fit together.'" Had such a statement been made, it might have run afoul of the court's instructions to the jury that each defendant's statement could only come in against the *defendant who made it.* But that did not happen; Muhammad misreads the record when he suggests that it did.

The prosecutor did not argue that the *confessions* were interlocking; rather, in referring to "the witnesses on the scene," he said only that *"their versions of events* are corroborated by each other. They all saw some bit or piece of the whole thing. And you can trust what they say because it all fits together." Pointing out that the testimony of several witnesses about what happened "all fits together"—a standard argument made in many cases by both prosecutors and defense attorneys—is not the same as saying that the *defendants' statements* "fit together." Moreover, when discussing the appellants' several confessions, the prosecutor reminded the jury about the rule regarding those confessions: "what the defendants said in their statements to the police ... comes in against each individual defendant only."